Good morning. May it please the Court, my name is Sarah Hemmendinger. I represent Petitioner Somi Kongmasang. With the Court's permission, I'd like to reserve two minutes for rebuttal. Mr. Kongmasang petitions for review of a final order of the Board of Immigration Appeals denying his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture. The immigration judge in this case, based on a review solely of a cold record, found that Mr. Kongmasang failed to establish that he was a credible witness. The Board of Immigration Appeals found that the adverse credibility determination was not clearly erroneous. The agency's determination, however, was reached in violation of Mr. Kongmasang's due process rights. Sotomayor, you're saying that because of the comment that the — in the opinion that the I.J. said, I've observed his demeanor when it was a different I.J. Yes, ma'am. And that statement didn't play any role in the ultimate decision because none of the inconsistencies that were referred to had anything to do with demeanor. And except for that passing comment, demeanor wasn't relevant. And I guess because prejudice is a required element of a due process claim, I don't understand where the prejudice from that comment could lie. Mr. Kongmasang was prejudiced by this violation because the entire adverse credibility determination determined the outcome in this case, and nobody else. Well, yes, it did, but the demeanor didn't determine the adverse credibility. They looked at things like you wrote in your declaration that your father died in prison, but then when you testified, you said he died five years after he was released from prison and not die in prison, and a whole litany of was he in business with his relative, or did he use weapons, and a whole variety of things that bore no resemblance to demeanor. We would submit that the statement about demeanor at the outset of the opinion does affect the other stated basis for this determination. In one way, because of the standard of review. The reason that the Board deferred to the I.J.'s findings in this case and that the government asked this Court to defer to the agency's findings is because of the understanding that the I.J. took live testimony, observed the witness, and was in the best position  Sotomayor, there's a regulation that says that the BIA only reviews for clear error. So regardless of what is said, they're still looking for clear error in the relevant findings about the inconsistencies. Yes. But on the understanding that the reason for the clear error review is because in the normal course, an I.J. is in a position to make a live observation of the witness. Well, maybe so, but I don't understand how that has any bearing on the fact that, you know, he says my father died in prison, then he says, well, my father didn't die in prison, and that's not the same regardless of his demeanor. It also is relevant that the I.J. did not make a personal observation because of the particularities of this case. But we all know that. We know that the I.J. didn't make the determination. Yes, Your Honor. So in a case in which the I.J. doesn't make the determination, put aside the error here, your infection argument, what's our standard of review of the I.J.'s absence of credibility finding? In a situation where the I.J. hasn't made a personal observation, we would submit that the standard review — I know you submit it. Tell me what case — No. Tell me what case says that we exercise anything but abusive discretion, substantial evidence review, when the I.J. makes a finding from the record. I believe it's Mendoza-Menbiombo — I'll get the site for you — where the Court noted that in that case, the — there would not be a deferential review of the I.J.'s determination, and gave the Court an option — gave the parties an option to either remand to the I.J. to make a credibility finding in the first instance or said that there wouldn't be deferential review. Well, there can't be a credibility finding here on this record because the I.J. who heard the thing is no longer there. So are you saying you must always have an I.J. who heard the thing make a credibility finding? Not that it must always be, but in the particular circumstances of this case where we have a witness — Why? Why? Let's just remove the — remove the boilerplate that the I.J. stuck in about having observed the demeanor. Standing alone with these — and even if we reviewed them de novo, wouldn't these findings of absence of credibility support the denial of the petition? They wouldn't because these are trivial inconsistencies that are not a sufficient basis to fort. That's a completely different argument, though. Yes, Your Honor. But the reason — but even then, so if the Court was looking at this de novo, the trivial inconsistencies wouldn't support the adverse credibility determination. Why are they trivial? They're trivial because they relate to events from nearly 50 years ago, and in — this witness was testifying through a translator over the course of eight hearings that took place over four years, and inconsistencies as to the specific date of when he was imprisoned in 1967 versus — But, counsel, that seems to me begging us to reweigh the findings, the credibility determinations. You used the word — admittedly, they were inconsistencies. You have reasons why you believe your client was confused or that these inconsistencies were trivial, but that seems like we're weighing the judgment here of the lower proceedings. Even if the Court was not — conducts an analysis where it is deferring to the I.J.'s findings, still can't be trivial inconsistencies that have no bearing on a Petitioner's veracity. That's my point. The labeling of whether it's trivial or really outcome-determinative in the final analysis, that seems like a reweighing to me. Your Honor, the language regarding trivial inconsistencies comes from Shresha versus Holder in this Court's — this Court's case about how to address an I.J.'s findings. And this Court can look and see whether or not the findings were supported by substantial evidence, and whether or not they were so trivial that — If you assume that they were trivial, is there some point where the cumulative effect of all of that make them nontrivial? Again, it seems to me you're reweighing. There could be a case where there were so many inconsistencies that they would not — that it would support the I.J.'s findings, but this is not that case. The inconsistencies that the government points to here relate to events from the late 1960s and 1970s, and one has to consider — consider the totality of the circumstances here. And in the totality of the circumstances, given Mr. Congvasing's consistent account of persecution and torture, and the government has not — So you're saying that the government — that the I.J. must accept that? See, the I.J. in this case says, and I think that this is correct, in the absence of Mr. Congvasing's testimony, there is not much evidence of past persecution. It's his — it's his testimony that establishes it. And he says, and I don't believe his testimony because it's inconsistent in many respects with — with the record. So why isn't — why isn't that a substantial basis for rejecting it? For two reasons. First, because the I.J. has to consider the totality of the circumstances before rejecting his testimony, and as we previously mentioned, we don't think that those — the reasons that he pointed to for rejecting his testimony were sufficient. The I.J. also erred in rejecting certain of Mr. Congvasing's corroborating evidence that would have supported his — his testimony, for example, the declarations of his two sons. Well, they considered that and said it just doesn't outweigh all the many inconsistencies on things like when was he arrested and when did his dad die and all the many other things that they looked at. They looked at it and said it's just not convincing enough. And on the particular issue of the declarations of his sons, the — the I.J. decided to afford them little weight solely because they were consistent, and we — that was all — Well, they were — not because they were consistent, because they were in — they were virtually identical. They were very similar, but that is not something that would weigh against whether or not he — Well, he seemed to say they were — they seemed to be constructed, and I give them little weight. He may have been wrong, but do we have the ability to say he — he erred by giving them little weight? Yes, you do. He could have — if he rejected them, if he said I won't consider them, I'd understand it, but I — He gave them little weight solely because they were consistent, and that was erroneous. I see here that I've gone over my — You may — you may save the rest of your time. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, Jenny Lee on behalf of the Respondent, the Attorney General of the United States. Good morning. The Court should uphold the agency's denial of Mr. Kangmasang's protection applications because the record does not compel a conclusion that Mr. Kangmasang was credible for three reasons. First, Mr. Kangmasang bore the burden of proof, which means having a core story is not sufficient. He must establish his claim with credible, persuasive, and specific evidence. He had an opportunity to call his daughter as a witness, and in fact, he provided — she provided a waiver to do so. If he didn't have the inconsistencies that was found by the IJ, would he have presented an approvable claim? If he didn't have the inconsistencies, then we would have a different case, obviously. Mr. Kangmasang bore the burden. Well, I guess another way to ask the question that Judge Lamel is asking, I think, is to say, if he were credible, did he present a sufficient case? If he was credible, then I believe he did present a — I apologize. No. If we were to reject, if we were to agree with your colleague that the inconsistencies found were trivial and not enough to justify an adverse credibility finding, then at least on the face of it, he would have a reasonable withholding claim, would he not? Except both modifications of the question. I think we're all hitting at the same thing. What happens here is that nobody understands our first question, and we keep improving it. It was my fault. Thank you, Your Honor. You understand the question? Yes, I do understand the question. And in this case, the Board just relied on the adverse credibility. Right. The immigration judge did make an alternative finding, and the immigration judge found that even if Mr. Kangmasang was credible, he did not establish eligibility for asylum withholding. But the Board did not rely on that. That is correct, Your Honor. So we can't either. Correct? That is correct, Your Honor. Thank you. Okay. So now let me go back to — let me tell you the two things that trouble me about this case and see if you can respond to them. One is the thing your colleague argues. We have a finding here that is clearly not supported by substantial evidence, which is to say that Mr. Kangmasang's demeanor was such that there was an adverse credibility finding because the IJ never saw him. So he made at least one finding that is plainly not supported by substantial evidence. In light of that, why shouldn't we remand? Or why doesn't that, as your colleague suggests, infect the rest of his findings? Well, Mr. Kangmasang's due process claim lacks merit for many reasons. Although the immigration judge mistakenly said that he carefully observed Mr. Kangmasang's demeanor and that didn't happen, he can't show prejudice or any taint because the Board specifically declined to consider it in making its determination. And Mr. Kangmasang, Petitioner, makes a two-pronged attack about the immigration judge, making — I guess the immigration judge who decided the case was not the same one who heard the testimony. The regulations specifically provide for such situations. No, we don't. No one doubts — no one doubts in this case that once somebody retires, a new judge has to take over. That's easy. The question is the new judge made a finding that's completely unsupported by the record. And if the — I'm sorry. Go ahead, Judge. And if the BIA rejected to even consider it, is that not problematic in terms of due process? Well, as Judge Hurwitz earlier indicated, in order to establish due process, you would have to show prejudice. And here — Well, isn't that prejudice if you — Well, if — If you consider it? If an immigration judge makes an adverse credibility determination based on demeanor, we, all of us, would demand a particularized, specific finding. We don't have one here. So how can — Yeah, I guess that's a question that I have. There is a sentence that says that the Court carefully observed his demeanor. There's that phrase. But I don't see it playing any further role, because all the remainder of the discussion on credibility, which goes on for many, many pages, deals with specific inconsistencies. He testified A, but then he testified B. He testified D, but his declaration said X. So I guess what I'm trying to sort out is whether that is, in fact, a finding that isn't supported or whether it's a passing comment that turns out not to matter. Thank you, Your Honor. I believe that it was a passing statement that doesn't make — it doesn't matter, because there's nowhere in the immigration judge's decision that you can argue. So your argument is that there's no prejudice? That's correct, Your Honor. So let me ask you this second point, because I'm not sure you'll get to this otherwise. Mr. Kongmasang's daughter petitioned for relief and got it, correct? That is correct, Your Honor. Her case, so far as I can tell, doesn't seem to be as strong as his. In other words, most of her persecution claims seem to be either identical or derivative. Do we have any inconsistency issues here? Well, Your Honor, the benefit that his daughter had was that there was not another application based on remarkably similar facts out there in order to make the comparisons to. Mr. Kongmasang's daughter was his witness, and if there was any fallout from inconsistencies between his testimony and her application, it was on him. No, I understand. I'm asking a broader question, and maybe there's nothing we can do about it. His daughter shows up, applies for asylum or withholding, I forget which of the two, and gets granted it based on a set of claims almost identical to Mr. Kongmasang's and probably less compelling than his claims. He shows up, and the same administrative tribunal says, no, you haven't proved your claim. Stepping back from the case, that's what troubles me here. I don't know. Is there anything we can do about that? Unfortunately, that's something left to Congress, but the Immigration Nationality Act for Asylum Law allows an alien to establish her claim based on her own testimony if it's specific, credible, and persuasive. His daughter's testimony was for her. She was able to establish her eligibility based on her testimony alone. So you're saying he should have brought her in to testify? There are at least two possibilities. One is that his claim should have been granted, but the other is that her claim should have been denied. She was just more persuasive. I mean, we don't know, really. We have no way to know. Unfortunately, Your Honor, we have no way of knowing. And Mr. Kongmasang had the opportunity to call his daughter as his witness and have her clarify the inconsistencies, the conflict there was between his testimony and her asylum application, but he specifically withdrew her. And if there are any consequences that fall out from that withdrawal, that's on him, not on the agency. What you're saying is he should have called her to have her repeat her story and to the extent it would have supported him. Then the I.J. would have known it. Yes. And the immigration judge and the board specifically noted that it would have been very helpful had she testified. But again, he withdrew her without any explanation. The second reason that the agency's decision is supported by substantial evidence is that we're looking at the totality of the circumstances. We're not looking for one amongst many. We're not nitpicking each of the agency's adverse credibility determinations to see if under a light to see if each one holds, because that's not how it's done when you're looking at the totality of the circumstances. The Supreme Court stated in a suppression case that was cited in Shrestha that you circumstances may undermine credibility. And that's in footnote 4 of Shrestha v. Holder. I apologize because I'm completely butchering that name. We all do. Welcome to the club. A common problem in this Court. And leading me to my third reason as to why the agency's decision is supported by substantial evidence is the standard of review. We can't just ignore the standard of review because a Petitioner wants us to. The standard of review is that simply because there's a possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from not being supported by substantial evidence. Simply because there's disagreement, that doesn't mean Petitioner wins. Sotomayor, if we were to view the incorrect statement as being that I saw the person's finding that is clearly wrong, does that alter the standard of review, or how does that relate in your view to how we look at the case? We would have to look at the totality of the circumstances. And in the totality of the circumstances, there is not anywhere in the immigration judge's decision, aside from that one little statement, that taints the determination. So if the immigration judge's decision contains an incorrect statement, serious incorrect statement, that combined with the inconsistencies of this gentleman's application and testimony, is in your view not outcome determinative? That is correct, Your Honor. You would have to show where that demeanor finding made any influence on the address credit. I guess my concern with that is that if you assume that the IJ simply misspoke, but as Judge Graven mentioned, they said, they used the word carefully reviewed the demeanor, not something casual. Carefully reviewed demeanor. That seems substantial to me, not trivial. It could be throat clear language. I'm not sure why that was in there. But based on the totality of the circumstances, the record supports the agency's determination. Thank you, Your Honors. Thank you. You have some rebuttal time remaining. I'd just like to return to the question of prejudice. Mr. Kong was saying was prejudiced by the lack of live assessment of his credibility and demeanor here. The issue with making an adverse credibility determination without live observation is particularly acute here. Mr. Kong was saying speaks a regional dialect that made testifying difficult. His testimony was taken over the course of eight hearings over three years. And one of the inconsistencies that the government points to is whether or not Mr. Kong was a clothing shop or was a business partner in the store. And immediately after translating a statement that the government points to, maybe because Mr. Searing and me are business partners in the store, the interpreter told the judge, Your Honor, he was saying something, but he was saying in a very strong local accent, I can't understand what he's saying. And the record contains many other similar examples of issues in translation. And that actually is not a claim that was made in the briefing, as I understand it, that there was mistranslation or that translation difficulties require a remand for a new hearing. Am I missing something? Your Honor, we did point to issues in translation both in our opening brief and in our reply brief. Aren't you required to do that at the BIA? Aren't you required at the BIA to say there are mistranslations here and, therefore, we want to and submit what the real translations are? Preserve it for our review. We've pointed out in our briefing instances where there were mistranslations, but it also goes to the totality of the BIA. No, no. Judge Hurwitz is asking a different question. He's asking a jurisdictional question that is an issue that is not exhausted before the agency. We have no opportunity to rule on it at all. And so the question, I think, a better question than mine as we correct each other's questions, is whether this is an argument that was raised to the BIA. I believe issues with his regional dialect were raised to the BIA, but they also form, again, part of the totality of the circumstances and make up the general circumstances. Well, but in the absence of, see, here's the difficulty. You may well be right, but we're now on review of an agency decision. In the absence of something in the agency record where you've made that argument to the agency and say, therefore, the absence of an accurate translation prejudiced him in some way, I don't think we have jurisdiction to consider it. I believe it goes to the issue with a lack of a in-person hearing at all and is part and parcel of the same issue of why a live assessment was needed in this case, and that certainly was raised to the BIA. So your argument's different, then. Your argument is that in the absence of live assessment, a second IJ could not make adverse credibility finding? Our argument is that in this case, a live assessment would be needed to make an adverse credibility. But how is that different from any other case in which an IJ goes somewhere else for work or dies or whatever, and another IJ is charged with making a decision? Is it your view that there's always a need for a new hearing? This case is somewhat unusual in terms of the number of hearings and the length of time over which they took place, but in these circumstances where the IJ made the explicit statement at the outset that he did carefully consider? No, no. I'm asking a different question because your argument seems to be broader than pointing out this one erroneous statement. You seem to be saying that how can an IJ ever make an adverse credibility finding if he or she wasn't personally present during the hearing? Yes, our ---- And so that's my question to you, is whether your argument is that there always has to be a new hearing so that the IJ writing the opinion is the same person who was physically present earlier? It would be certainly the best practice and the best way of comporting with what the law requires on this. It wouldn't necessarily, maybe in every circumstance I understand that IJs need to retire, but in the circumstances of this case, with the length of the record that was developed with the IJ over three years and the number of hearings, it wasn't permissible to have a new IJ come in, make this adverse ---- So what do you cite for that proposition? Let's listen to what the new IJ had said. You know, I wasn't there, so I didn't make any demeanor calls, but I've read this record and I found the following six inconsistencies. And to me, they make his testimony not credible. Are you saying that's not permissible? In your case, in your case. You're saying in your case you absolutely, as a matter of constitutional law, because there's no statutory basis for the claim, have entitlement to a new IJ? In O'Shodey v. Holder, and the cases cited in O'Shodey v. Holder make clear the need for live assessment to undertake fact-finding and that you can't simply judge somebody's credibility on the basis of a cold record. And so that would support the need for a new IJ to come in and make a live assessment. Thank you, counsel. Thank you, Your Honors. The case just argued is submitted and we appreciate very much the arguments of We'll take a recess for about 10 minutes before hearing the rest of the cases.
judges: Graber, Hurwitz, Lemelle